# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUL 2 4 2009 ★

BROOKLYN OFFICE

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM )<br>OF MISSISSIPPI, on behalf of itself and all others )<br>similarly situated, )<br> )<br>Plaintiffs, )<br> )<br>vs. )<br> )<br>MOODY'S INVESTORS SERVICE, INC.; FITCH )<br>GROUP, INC.; and THE McGRAW-HILL )<br>COMPANIES, INC. )<br> )<br>Defendants. )<br> ) | CLASS ACTION COMPLAINT<br>FOR VIOLATIONS OF THE<br>SECURITIES ACT OF 1933<br><br><br>JURY TRIAL DEMANDED |

# 09 3209

# BIANCO, J.

# BOYLE, M.J

Doc. 164661

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.    MATERIALLY UNTRUE STATEMENTS AND OMISSIONS . . . . . . . . . . . . . . . . . . 7

V.     CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

VI.    COUNTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VII.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VIII.  JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

## I.   NATURE OF THE ACTION

1.     Plaintiff, the Public Employees' Retirement System of Mississippi ("MissPERS" or "Plaintiff"), brings this securities class action on behalf of itself and all persons or entities who purchased the mortgage pass-through certificates (the "Certificates") issued pursuant or traceable to the untrue and misleading registration statement and supporting offering materials incorporated therein filed by JP Morgan Acceptance Corporation I ("JPMAC").

2.     This action, which involves solely strict liability and negligence-based claims brought pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), is being brought against defendants Moody's Investors Service, Inc. ("Moody's"), Fitch Group, Inc. ("Fitch"), and the McGraw-Hill Companies, Inc. ("McGraw-Hill") (collectively, the "Rating Agencies"). The Rating Agencies participated in the structuring of the Certificates and took steps necessary to the distribution of the Certificates, including providing pre-determined credit ratings. The issuance of the Certificates was expressly conditioned on the assignment of pre-determined ratings from the Rating Agencies.

3.     On December 7, 2005, JPMAC caused a Form S-3 Registration Statement (No. 333-130192) to be filed with the Securities and Exchange Commission ("SEC") in connection with the issuance of billions of dollars of Certificates.[1] The Certificates were sold to investors pursuant to Prospectuses and Prospectus Supplements, each of which was incorporated into the Registration Statement (collectively the "Offering Documents").

4.     The Certificates were supported by home mortgage loans (the "Mortgage Loans")

---

[1] Amendments to the Registration Statement were filed on Forms S-3/A on February 8, 2006, March 13, 2006 and April 3, 2006, respectively. All citations to the Registration Statement are to the third Amended Registration Statement filed on April 3, 2006.

originated by various lenders identified in the Offering Documents, including Chase Home Finance

LLC, WMC Mortgage Corporation, Countrywide Home Loans, Inc. and PHH Mortgage Corporation

(generally referred to as, the "Originators"). The Offering Documents represented that the mortgage

pools primarily consisted of loans secured by first or second liens on residential properties.

5.      Certificate holders effectively owned an interest in the underlying Mortgage Loans

and were entitled to receive "pass-through" distributions (payments of interest and, if applicable,

principal) made by loan borrowers. The Trusts issued the Certificates in multiple "tranches," or

classes, which were generally organized according to the priority with which they were entitled to

receive the "pass-through" distributions. In general, those tranches designated as "senior" received

distributions ahead of those designated as "subordinate." This capital structure required the lower-

ranked, subordinate tranches to absorb losses first, but paid investors a higher coupon rate.

6.      The Rating Agencies played a vital role in the Certificates' creation and sale by

structuring the Mortgage Loans into their various tranches. The Rating Agencies selected the

Mortgage Loans comprising the loan pools and divided the pools into senior and subordinate

Certificates; a process known as securitization. This transformed the undifferentiated pools of

Mortgage Loans into a hierarchy of securities with distinct risk attributes to match the distinct risk

preferences of investors.

7.      Only a certain number of "AAA" rated, senior tranches could be created in the

structuring process. These "AAA" tranches were the most highly desired securities of institutional

investors, like MissPERS. As such, the Rating Agencies and JPMAC had a financial incentive to

create the maximum amount of "AAA" tranches from the pool of Mortgage Loans to sell to

institutional investors. Since only the Rating Agencies knew how to structure the MBS deals so they

2

could maximize the number of "AAA" tranches produced, the Rating Agencies held the key to creating salable MBS.

8.      Issuers told the Rating Agencies the ratings they wanted for their securities, and the Rating Agencies structured the MBS to achieve the desired ratings. Thus, according to a former Moody's Chief Operating Officer, the Rating Agencies did not passively rate pre-structured MBS, but instead "start[ed] with a rating and buil[t] a deal around a rating." As former SEC Chairman Christopher Cox explained to Congress in October 2008, the Rating Agencies "helped to design these securities so they could qualify for higher ratings."

9.      The Rating Agencies also assigned the Certificates the "investment grade" credit ratings that were a condition precedent to their issuance and, upon information and belief, also participated in the drafting of the Offering Documents pursuant to which the Certificates were sold to investors.

10.     The value of the Certificates was based on the quality of the underlying Mortgage Loans, as well as the loan collateral (*i.e.*, the mortgaged properties). Accordingly, the Offering Documents discussed the underwriting standards purportedly used in connection with the origination of the underlying Mortgage Loans and the statistical qualities of the Mortgage Loans that reflected their risk, such as their loan-to-value ("LTV") ratios. The Offering Documents also contained the credit ratings assigned to the Certificates.

11.     As "underwriters" directly participating in the Offering of the Certificates, the Rating Agencies were obligated to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that the statements contained therein were true and did not omit material facts. However, due to the Rating Agencies' negligence, this did not occur. As a result,

MissPERS and other investors suffered damages.

12.    For example, the Offering Documents contained untrue statements that the Mortgage Loans were originated pursuant to the underwriting guidelines stated in the Offering Documents. In truth, however, the Originators routinely disregarded the disclosed underwriting standards in an effort to boost their loan production.   Specifically, loans were issued to borrowers without first assessing the borrowers' ability to repay the loans, such as by analyzing borrowers' credit histories, incomes, and the adequacy of the mortgaged properties as collateral.

13.    Even where such analyses were purportedly undertaken, Originators did not ensure the accuracy of such data and even encouraged its falsification.   For example, Originators inflated borrowers' home appraisal values and incomes in order to allow borrowers to qualify for loans that required them to have lower loan-to-value ratios (the ratios moving in the inverse of the values being inflated).   Originators also approved loans to borrowers based on financial information that was implausible on its face. These facts were misrepresented or were not disclosed to investors.

14.    The Offering Documents omitted and/or misrepresented the fact that the Rating Agencies did not utilize appropriate methodologies and models to properly evaluate the credit quality of the Mortgage Loans when assigning their "investment-grade" ratings.   Ultimately, the ratings were downgraded, in many cases to below investment-grade.   For example, MissPERS purchased JPMAC Acquisition Trust 2006-WMC3 Class A3, which was downgraded to "B3" by Moody's on October 30, 2008.

15.    These practices, which were not disclosed in the Offering Documents, resulted in the Mortgage Loans experiencing substantially higher rates of delinquencies, defaults and foreclosures than what would be expected for mortgage loans of the types described in the Offering Documents.

This was to the detriment of investors in the Certificates, including MissPERS.

16.     The current delinquency rates (including delinquency, bankruptcy, foreclosure and REO) of the Mortgage Loans in Trusts purchased by MissPERS are as much as 33%.

## II.     JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77o).

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)) and 28 U.S.C. § 1331.

19.     Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein occurred in substantial part in this District, including the marketing and sale of the Certificates.  All of the Rating Agencies are located and/or regularly conduct business in this District.

20.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## III.     PARTIES

21.     Plaintiff Public Employees' Retirement System of Mississippi is a public pension fund that invests funds for the benefit of the current and retired public employees of the state of Mississippi.  MissPERS acquired certain Certificates in the Offerings and has been damaged thereby, as reflected in the Certification of MissPERS attached hereto.

22.     Defendant Moody's Investors Service, Inc., a division of Moody's Corp., is a credit rating agency with its principal offices located at 7 World Trade Center at 250 Greenwich Street, New York, New York 10007. ("Moody's" shall refer collectively to Moody's Corp. and Moody's

Investors Service, Inc.).

23.     Defendant Fitch Group, Inc. maintains a business division doing business as "Fitch Ratings, Ltd.," which is a majority-owned subsidiary of Fimalac, S.A. ("Fitch" shall refer collectively to Fitch Group, Inc. and Fitch Ratings, Ltd.). Defendant Fitch is a credit rating agency with its headquarters located at One State Street Plaza, New York, New York 10004.

24.     Defendant The McGraw-Hill Companies, Inc. maintains a business division doing business as "Standard & Poor's Financial Services LLC" ("S&P" shall refer collectively to McGraw-Hill and Standard & Poor's Financial Services LLC). Defendant S&P is a credit rating agency with its headquarters located at 55 Water Street, New York, New York 10041.

25.     Non-defendant J.P. Morgan Acceptance is a Delaware corporation headquartered in New York, New York. It is a special purpose corporation formed in 1988 and a subsidiary of J.P. Morgan Securities Inc.

26.     As noted above, JPMAC filed the Registration Statement (No. 333-130192) in order to sell billions of dollars in mortgage-backed securities ("MBS") through the following Issuing Trusts:

| | |
|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A4 | J.P. Morgan Mortgage Trust 2006-A5 |
| J.P. Morgan Alternative Loan Trust 2006-A5 | J.P. Morgan Mortgage Trust 2006-A6 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Mortgage Trust 2006-A7 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Mortgage Trust 2007-A1 |
| J.P. Morgan Alternative Loan Trust 2006-S4 | J.P. Morgan Mortgage Trust 2007-A2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-CH2 | J.P. Morgan Mortgage Trust 2007-S1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-RM1 | J.P. Morgan Mortgage Acquisition Trust 2006-HE3 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WF1 | J.P. Morgan Mortgage Acquisition Trust 2007-CH1 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | J.P. Morgan Mortgage Acquisition Trust 2007-CH2 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 | |

## IV.    MATERIALLY UNTRUE STATEMENTS AND OMISSIONS

27.    The Offering Documents provided pertinent information about the Mortgage Loans backing the Certificates and critical information about the methodology used to determine the credit ratings assigned to the Certificates. However, as described below, this information was materially untrue and omitted material information necessary to make the statements therein not misleading.

### A.    Untrue Statements And Omissions Concerning Rating Methods

28.    The Offering Documents stated that, as condition precedent to the issuance of the Certificates, the Rating Agencies were required to rate them and assign them "investment-grade" ratings:

> It is a condition to the issuance of the securities of each series offered by this prospectus that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies specified in the related prospectus supplement.

29.    The Offering Documents also stated that, in assigning these ratings, the Rating Agencies were to take into consideration the overall credit quality of the mortgage pool and determine the likelihood that Certificate holders would receive all "pass-through" distributions to which they were entitled:

> The ratings assigned to mortgage pass through certificates address the likelihood of the receipt of all payments on the mortgage loans by the related certificateholders under the agreements pursuant to which such certificates are issued. Such ratings take into consideration the credit quality of the related mortgage pool, including any credit support providers, structural and legal aspects associated with such certificates, and the extent to which the payment stream on the mortgage pool is adequate to make the payments required by such certificates.

30.    These representations were untrue and misleading because the Offering Documents did not disclose that the Rating Agencies negligently evaluated and assigned "investment-grade" ratings to the Certificates pursuant to a defective ratings process that involved reliance upon

inadequate and antiquated ratings models that considered historical data that was outdated – even while newer and better models had been developed. Moreover, the Rating Agencies relied on loan statistical information that failed to account for the true risk of the securities, and suspect Mortgage Loan data provided by Originators that they did not independently evaluate or verify.

31.     The Rating Agencies have now downgraded hundreds of tranches of MBS certificates that were initially rated "investment-grade" and "triple-A." The Rating Agencies have now admitted that the models they used to evaluate underlying Mortgage Loans and assign MBS ratings were inadequate, outdated and needed to be revised. In an instant-message conversation between two S&P employees in the firm's structured product division that was produced to Congress in October 2008, the employees stated that the MBS deal they were rating was "ridiculous" and that S&P's ratings model "doesn't capture half the risk" of the MBS and "[w]e should not be rating it."

32.     According to The New York Times, in rating complex securities such as MBS and CDOs (derived from MBS), the Rating Agencies used statistical models based on historical default patterns and past data that were no longer relevant in the current environment. By way of example, The New York Times took a closer look at a $750 million mortgaged-backed securitization that Moody's rated in late 2006 using its outdated model:

> Moody's used statistical models to assess C.D.O.'s; it relied on historical patterns of default. *This assumed that the past would remain relevant in an era in which the mortgage industry was morphing into a wildly speculative business.*
> ***
> *Moody's rated three-quarters of this C.D.O.'s bonds triple-A.* The ratings were derived using a mathematical construct known as a Monte Carlo simulation -- as if each of the underlying bonds would perform like cards drawn at random from a deck of mortgage bonds in the past. *There were two problems with this approach. First, the bonds weren't like those in the past; the mortgage market had changed.* As Mark Adelson, a former managing director in Moody's structured-finance division, remarks, it was "like observing 100 years of weather in Antarctica to forecast the weather in Hawaii." *And second, the bonds weren't random. Moody's had underestimated the extent to which underwriting standards had weakened*

*everywhere. When one mortgage bond failed, the odds were that others would, too.*

Moody's estimated that this C.D.O. could potentially incur losses of 2 percent. It has since revised its estimate to 27 percent. The bonds it rated have been decimated, their market value having plunged by half or more. A triple-A layer of bonds has been downgraded 16 notches, all the way to B. Hundreds of C.D.O.'s have suffered similar fates (most of Wall Street's losses have been on C.D.O.'s). For Moody's and the other rating agencies, it has been an extraordinary rout.

The New York Times, *Triple-A Failure*, April 27, 2008 ("Triple-A Failure") (emphasis added).

33.     According to Jerome Fons, a former Managing Director of Credit Policy at Moody's, the Rating Agencies "did not update their models or their thinking" during the period of deterioration in credit standards.  Congressional Hearing Testimony - October 22, 2008.

34.     Frank Raiter, the former Managing Director and Head of Residential Mortgage Backed Securities Ratings at S&P, was even more adamant that the problems with the ratings models were directly caused by the Rating Agencies' actions (or inactions) in not updating their models on a timely basis, as they had done for years, and were not the result of unanticipated economic conditions.  In fact, by early 2004, S&P had developed a ratings model that considered nearly 10 million loans that "covered the full spectrum of new mortgage products, particularly in the Alt-A and fixed/floating payment type categories."     However, that model was never implemented.  According to Raiter's written testimony to Congress in 2008:

An unfortunate consequence of continuing to use out- dated versions of the rating model was the failure to capture changes in performance of the new non-prime products. As a result, *expected loss estimates no longer provided the equity necessary to support the AAA bonds. This, in turn, generated the unprecedented number of AAA downgrades and subsequent collapse of prices in the RMBS market.*

Congressional Hearing, October 22, 2008 – Frank Raiter (emphasis added).

35.     In addition to admitting that their methodologies were outdated, representatives of Moody's also admitted that they assigned "triple-A" ratings to securities derived from poor quality

loans without independently evaluating the borrower and loan data they received from loan

originators and MBS issuers. As Raiter stated in his written testimony to Congress in 2008:

> In addition to problems with maintaining adequate ratings criteria and models, there
> were other aspects of rating agency procedures that contributed to the current crisis.
> . . . . [One] area that deserves attention . . . is in the document reviews, the
> "structure" in structured finance. The foundation of the rating analysis is the data
> relied on for determining credit enhancement levels. *Rating agencies do not perform
> "due diligence" on the data . . . .*

Congressional Testimony, October 22, 2008 – Frank Raiter (emphasis added).

36.     Raiter also told Congress that the Rating Agencies did not even look at the tapes

containing the borrower data for the underlying loans before they fed that data into their models and

warranted the accuracy of the resulting ratings:

> <u>Rep. Thomas M. Davis III</u>: "Now, the rating can only be as good, then, as the data
> that's put into the models."
>
> <u>Raiter</u>: "Correct."
>
> <u>Rep. T. Davis</u>: "But there's no independent verification that the data is accurate."
>
> <u>Raiter</u>: "No independent verification of the [underlying mortgage tapes by the Rating
> Agencies], that's correct."
>
> ***
>
> "From the loan originators and the borrowers who might have fudged home buyers'
> creditworthiness, employment history, to the issuers who packaged these mortgages
> and wanted to get the highest possible rating – it looks to me like there were a lot of
> places along the line where the data that ultimately makes it to the rating agencies
> could be made unreliable."
>
> ***
>
> <u>Rep. T. Davis</u>: "OK. Now, *if it's not the rating agencies' job to ensure the accuracy
> of the data it's using to rate these securities, whose job is it?*"
>
> <u>Raiter</u>: "That's correct. *We determined that it was better to put the onus on the
> issuer.*"

Congressional Hearing, October 22, 2008 – Frank Raiter (emphasis added).

37.     According to a Moody's official, a frustrated Blackrock employee stated that:

"The rating agency process is run to be efficient rather than to 'have a good sense of the pieces'" he commented . . . . He said that in RMBS, analysts "relied too much on manufactured data that is weak." He emphasized that *there's a "too much reliance on data not fully verified." He questioned any analyst's ability to adequately analyze data without a long track record of performance.* He asked, "How do you establish quality on low doc loans? How do you rate that? It's not just LTV [Ratios]. There's been a lack of pro-active questioning."

38.     Similarly, *Triple-A Failure* reported that when rating MBS:

*Moody's did not have access to the individual loan files, much less did it communicate with the borrowers or try to verify the information they provided in their loan applications.* "We aren't loan officers," Claire Robinson, a 20-year veteran who is in charge of asset-backed finance for Moody's, told me. "Our expertise is as statisticians on an aggregate basis. We want to know, of 1,000 individuals, based on historical performance, what percent will pay their loans?"

*Triple-A Failure* (emphasis added).

39.     Consequently, investors who purchased the Certificates were denied crucial information – omitted from the Offering Documents – detailing how the ratings were based on outdated ratings models and non-verified loan data, which combined to erode the ratings' predictive value about the riskiness of the Certificates to which they were assigned.

40.     The Offering Documents included the initial ratings for each Certificate tranche assigned by the Rating Agencies. A majority of the Certificates were rated "AAA" – the highest possible credit rating that indicates minimal credit risk. However, as a result of the undisclosed problems with the Rating Agencies' ratings process described above, the Rating Agencies have downgraded a majority of the "AAA" rated tranches, many to below "investment-grade," or "junk."

41.     The charts below lists several of the Certificates that MissPERS purchased and certain of their corresponding ratings downgrades, many of which have now been downgraded to non-investment grade securities:

| JP Morgan Mortgage Trust 2006-A5 Class 2A1 | Moody's | S&P | Fitch |
|---|---|---|---|
| Initial rating | Aaa | – | AAA |
| 11/21/08 | A1 | – | – |
| 4/6/09 | – | – | BBB |

| JP Morgan Mortgage Trust 2007-A1 Class 6A1 | Moody's | S&P | Fitch |
|---|---|---|---|
| Initial Rating | Aaa | AAA | AAA |
| 11/21/08 | Aa3 | – | – |
| 4/8/09 | – | – | AA |
| 5/1/09 | B3 | – | – |
| 6/8/09 | – | AA | – |

| JP Morgan Alternative Loan Trust 2006-A4 Class A7 | Moody's | S&P | Fitch |
|---|---|---|---|
| Initial Rating | Aaa | AAA | – |
| 1/29/09 | Caa1 | – | – |

| JP Morgan Mortgage Acquisition Trust 2006-WMC3 Class A3 | Moody's | S&P | Fitch |
|---|---|---|---|
| Initial Rating | Aaa | AAA | AAA |
| 10/30/08 | B3 | – | – |
| 11/24/08 | – | – | BB |
| 3/24/09 | Caa3 | – | – |
| 6/12/09 | – | – | CC |

| JP Morgan Mortgage Acquisition Trust 2006-RM1 Class A2 | Moody's | S&P | Fitch |
|---|---|---|---|
| Initial Rating | Aaa | AAA | AAA |
| 10/30/08 | Baa3 | -- | -- |
| 3/24/09 | Ba3 | -- | -- |
| 6/12/09 | -- | -- | B |

| JP Morgan Mortgage Acquisition Trust 2006-CH2 Class AV2 | Moody's | S&P | Fitch |
|---|---|---|---|
| Initial Rating | Aaa | AAA | AAA |
| 11/24/08 | -- | -- | A |
| 6/12/09 | A2 | -- | BB |

### B.   Untrue Statements And Omissions Concerning Loan Underwriting Practices

42.     The Offering Documents contained representations regarding the loan underwriting standards and practices purportedly followed in the origination of the Mortgage Loans backing the Certificates.

43.     Statements concerning the loan underwriting and property appraisals were particularly important to investors seeking to purchase the Certificates.  If the Mortgage Loans backing the Certificates experienced greater than expected defaults, Certificate owners would experience losses greater than what could be reasonably anticipated from the Offering Documents. Moreover, should homeowners fall behind on their payments, independent and accurate appraisals were crucial to ensuring that the foreclosed properties could be sold at a price that satisfied the loan amount.

44.     Accordingly, the Offering Documents stressed that prior to approving loans, Originators were required to evaluate a "borrower's credit standing and repayment ability, and the

value and adequacy of the related mortgaged property as collateral."

### i.     Borrower Repayment Ability

45.    With regard to analyzing a borrower's credit standing and repayment ability, the

Offering Documents stated that Originators evaluated verified borrower financial and credit

information included in the loan application.

> In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information. As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification reports, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future. If a prospective borrower is self-employed, the borrower may be required to submit copies of signed tax returns. The borrower may also be required to authorize verification of deposits at financial institutions where the borrower has demand or savings accounts.

46.    Loans could also be made to borrowers based on unverified or limited documentation

of their financial and credit data. However, this could only occur if the borrower "demonstrated an

established ability and willingness to repay the Mortgage Loans in a timely fashion." In addition,

lending requirements, such as maximum permissible LTV ratios, were tightened to account for any

additional risk. Furthermore, any additional exceptions from the established underwriting policies

could only be made on a loan-by-loan basis, and not until certain mitigating factors were carefully

considered.

> A lender may also originate mortgage loans pursuant to alternative sets of underwriting criteria under reduced or limited documentation programs. These programs are designed to facilitate the loan approval process. Under these programs, certain documentation concerning income/employment and asset verification is reduced or excluded. ***Loans underwritten under these programs are generally***

*limited to borrowers who have demonstrated an established ability and willingness to repay the mortgage loans in a timely fashion.* Permitted maximum loan-to-value ratios under these programs are generally more restrictive than those under the lender's standard underwriting criteria. (Emphasis added).

From time to time, exceptions to a lender's underwriting policies may be made. Such exceptions may be made on a loan-by-loan basis at the discretion of the lender's underwriter. Exceptions may be made after careful consideration of certain mitigating factors such as borrower liquidity, employment and residential stability and local economic conditions.

47.     These representations were untrue and misleading because the Originators abandoned their stated underwriting standards and practices and began pushing loans through at all costs, irrespective of the borrower's repayment ability. In fact, the Originators were so aggressive in approving and funding loans that many loans were made to borrowers who had either falsified the required documentation or had not submitted it to the lender. Exceptions to the stated underwriting practices swallowed the rule and were not made on a loan-by-loan basis after careful consideration and subject to other heightened lending requirements. As a result of these underwriting deficiencies, loans were made to unqualified borrowers who lacked the ability to repay the loan amounts, leading to the increased default and foreclosure rates experienced by the Mortgage Loan.

## ii.     Property Appraisals and LTV Ratios

48.     With regard to analyzing the value and adequacy of the mortgaged property to serve as collateral for the loan, the Offering Documents stated that loan underwriters evaluated information about the mortgaged property's appraised value. Appraisers were required to personally inspect each property and perform an appraisal in conformance with professional appraisal standards:

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or

acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

49.    The mortgaged property's appraised value was used to compute the loan's LTV ratio – an important variable in predicting a loan borrower's likelihood of default. The LTV ratio is a statistical expression of the amount of equity a borrower has in the mortgaged property – based on a comparison (ratio) between the amount of the mortgage loan and the value of the mortgaged property (as indicated by an appraisal) – that indicates the borrower's incentive to repay the loan. The specific LTV ratios for the Mortgage Loans, which were contained in the Offering Documents, provided investors with important information about the riskiness of the loans and in the Certificates derived therefrom.

50.    These representations regarding the appraisal standards and practices were untrue and misleading because Originators accepted appraisals that did not accurately reflect the true value and adequacy of the mortgaged properties serving as loan collateral.  Appraisers were pressured to produce pre-determined appraisal values that were not based upon the actual values of the properties and not performed in accordance with professional (USPAP) appraisal practices.

51.    Moreover, as a result of the inflated appraisals, the LTV ratios contained in the

Offering Documents materially overstated borrowers' equity in their homes and failed to disclose

that the mortgaged properties (acting as loan collateral) would be inadequate to cover the full loan

balance in the event of foreclosure. Furthermore, the lower documentation loan programs available

for certain borrowers, which were based on a concomitant tightening of other lending standards,

such as lowering permissible LTV ratios, were ineffective in protecting investors from risk of default

– as borrowers were not meeting the stated minimum LTV threshold described in the guidelines for

those particular loans.

### C.     Untrue Statements And Omissions Concerning The Originators

52.     As discussed above, the Offering Documents stated that the Mortgage Loans backing

the various Issuing Trusts were originated by multiple Originators. Each of these Originators had

their own/individual set of underwriting and appraisal guidelines that were included in the Offering

Documents, which were substantially similar to the general guidelines discussed above.

53.     As with the general guidelines, the Offering Documents failed to disclose that these

Originators abandoned their individual underwriting and appraisal guidelines to increase loan

production at all costs, resulting in the creation of poor quality loans that were unsupported by

borrowers' repayment ability and the value of the mortgaged properties. These severe underwriting

deficiencies led to increased loan defaults.

54.     One of the largest Originators of Mortgage Loans (by loan balance at origination) in

each of the Issuing Trusts was Countrywide Home Loans, Inc. ("Countrywide"), which originated

more than $2 billion of Mortgage Loans (or approximately 10% of the cumulative Mortgage Loan

pool). The pervasive underwriting and appraisal deficiencies at Countrywide have been widely

documented in lawsuits and news stories, and are representative of practices of numerous

Originators who sold Mortgage Loans to the Issuing Trusts.

55.     In 2008, a former regional manager at Countrywide, Mark Zachary, provided NBC News with internal documents that illustrated the pervasive lending deficiencies and fraudulent practices occurring at Countrywide since 2006. These included: (1) inflating home appraisals – so buyers could borrow enough to cover closing costs – and end up owing more than the house was worth; (2) flipping loans – moving an unqualified buyer from a conventional loan to one that does not require documentation, knowing the buyer could not actually afford the loan; (3) coaching borrowers – to overstate, even double, their income to qualify for loans; and (4) falsifying borrower documentation, such as W-2's and paystubs to clear loans. These lending violations were confirmed by other former Countrywide employees interviewed by NBC News in different parts of the country.

56.     In 2008 and 2009, Countrywide was named in multiple lawsuits for inflating home appraisals in order to inflate property values so that loans would close. According to press accounts, Countrywide "team[ed] up with KB Home to inflate prices on new homes . . . -- allegedly hurting consumers by placing them in deals with negative equity without their consent." "Countrywide and KB [Homes] were in cahoots, intent on sticking the homeowner with an inflated home appraisal to justify the purchase price." Through this practice, Countrywide earned substantial profits "at the expense of the homeowner, who moves into a house already upside-down, and the secondary market, buying tainted investments."

57.     In 2008, The Wall Street Journal first reported that the U.S. Federal Bureau of Investigations ("FBI") was investigating potentially fraudulent mortgage origination and underwriting practices at Countrywide. Prompting the FBI probe were the sky-high delinquency rate of loans originated by Countrywide – loans which eventually caused Countrywide to suffer

significant losses and nearly file for bankruptcy before being purchased by Bank of America.

## V.     **CLASS ACTION ALLEGATIONS**

58.     Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who purchased the Certificates issued pursuant and/or traceable to the untrue and misleading Offering Documents incorporated in Registration Statement (No. 333-130192) (the "Class"). Excluded from the Class are Defendants, their respective officers, affiliates and directors at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

59.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by JPMAC and/or J.P. Morgan or their transfer agents and may be notified of the pendency of this action by mail, the Internet or publication using the form of notice similar to that customarily used in securities class actions.

60.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Rating Agencies' wrongful conduct in violation of statutory law complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

62.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.      whether the Rating Agencies violated the Securities Act;

        b.      whether the Offering Documents contained materially untrue statements or omitted statements of material fact; and

        c.      to what extent the members of the Class have sustained damages pursuant to the statutory measure of damages.

      63.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**VI.**    **COUNTS**:

**COUNT I**
**Violation of Section 11 of the Securities Act**

      64.    Plaintiff repeats and realleges each and every allegation above as it is set forth in full herein.

      65.    Count I is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against all Defendants.

      66.    The Offering Documents, at the time they became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or that were necessary to make the statements therein true, as set forth above. The untrue and omitted facts would have been viewed by a reasonably prudent investor as important, and as substantially altering

the total mix of information available, when making investment decisions.

67.     The Rating Agencies are jointly and severally liable to Plaintiff and the Class for such untrue statements and omissions under Section 11 of the Securities Act, for acting as "underwriters," as that term is defined in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11), in the sale of the Certificates. The Rating Agencies evaluated the expected loss of the Mortgage Loans and structured the Certificates' tranches accordingly. The Rating Agencies were also required, as a condition precedent to the Offering, to issue the ratings identified in the Offering Documents, which they did. Finally, upon information and belief, the Rating Agencies prepared and reviewed the Offering Documents pursuant to which the Certificates were issued. As such, the Rating Agencies directly and indirectly participated in the distribution of the Certificates pursuant to the Offering Documents.

68.     The Rating Agencies owed to Plaintiff and the Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.

69.     The Rating Agencies did not make a reasonable investigation and perform due diligence and did not possess reasonable grounds for believing that the statements contained in the Offering Documents were true, did not omit any material fact, and were not materially misleading.

70.     Plaintiff and the Class members did not know, and in the exercise of reasonable diligence, could not have known of the untrue statements and omissions contained in the Offering Documents.

71.     Plaintiff and the Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Rating Agencies, for which they are entitled to compensation.

72.     This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## COUNT II
### Violation of Section 15 of the Securities Act

73.     Plaintiff repeats and realleges each and every allegation above as it is set forth in full herein.

74.     Count II is brought pursuant to Section 15 of the Securities Act, on behalf of Plaintiff and the Class, against all Defendants.

75.     The Rating Agencies were "control persons" of JPMAC under Section 15 of the Securities Act.  JPMAC is liable under Section 11 of the Securities Act as the issuer, although it has not been named as a defendant in this lawsuit.

76.     The Rating Agencies selected the Mortgage Loans to be included in the Issuing Trusts that collateralized the Certificates and issued the "investment-grade" ratings that were condition precedent to the sale of the Certificates.  The Rating Agencies had control over JPMAC vis-à-vis their ability to assign the pre-determined credit ratings that were a condition precedent to the sale of the Certificates. The Rating Agencies participated in the underlying violations of Section 11 by virtue of their direct participation in structuring the Certificates and their rating of the

Certificates. Thus, the Rating Agencies had the power and influence, and exercised that power and influence, to cause JPMAC to engage in violations of the Securities Act.

## VII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.      Determining that this action is a proper class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and appointing Plaintiff as Class Representative and its Counsel as Class Counsel;

b.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre and post judgment interest thereon;

c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

## VIII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 24, 2009
      New York, New York

Respectfully submitted,

**WOLF POPPER LLP**

By: _____

MARIAN P. ROSNER (MR-0410)
JAMES A. HARROD (JH-4400)
ROBERT S. PLOSKY (RP-7829)
845 Third Avenue
New York, NY 10022
Tel:   (212) 759-4600
Fax:   (212) 486-2093

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
GERALD H. SILK
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel.:   (212) 554-1400
Fax:   (212) 554-1444
      -and-
DAVID R. STICKNEY
TIMOTHY A. DeLANGE
DAVID A. THORPE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323

**POND, GADOW & TYLER, P.A.**
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201

*Counsel for Plaintiff Public Employees'*
*Retirement System of Mississippi*

## PLAINTIFF'S CERTIFICATION

I, George W. Neville, Esq., on behalf of the Public Employees' Retirement System of Mississippi ("MissPERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.      I am a Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi.   I have reviewed the draft complaint captioned <u>Public Employees'</u> <u>Retirement System of Mississippi v. Moody's Corp., et al.</u>  The Attorney General of the State of Mississippi has authorized the filing of a complaint on behalf of MissPERS by Wolf Popper LLP, Bernstein Litowitz Berger & Grossmann LLP and Pond Gadow & Tyler, P.A.

2.      MissPERS is willing to serve as a representative party on behalf of a class (the "Class"), including providing testimony at deposition and trial, if necessary.

3.      MissPERS's transactions in the pass-through certificates issued by J.P. Morgan Acceptance (and its related trusts), that are the subject of this action, pursuant to the Registration Statement numbered 333-130192 are attached to this Certification.

4.      MissPERS did not purchase these securities at the direction of counsel or in order to participate in this action.

5.      During the three-year period preceding the date of this Certification, MissPERS has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws:

- *In re Semtech Corporation Securities Litigation,* Case No. 07-cv-7114 (C.D. Cal.);
- *In re Ambac Financial Group, Inc. Securities Litigation,* Case No. 08-cv-411 (S.D.N.Y.);
- *In re Schering-Plough Corporation/Enhance Securities Litigation,* Case No. 08-cv-397 (D.N.J.);
- *In re Maxim Integrated Products, Inc. Securities Litigation,* Case No. 08-cv-832 (N.D. Cal.);

- *In re Royal Bank of Scotland Group plc Securities Litigation,* Case No. 09-cv-0300 (S.D.N.Y.);
- *Public Employees' Retirement System of Mississippi v. Goldman Sachs Group, Inc., et al.,* Case No. 09-cv-1110 (S.D.N.Y.);
- *Iron Workers Local No. 25 Pensions Fund v. Credit-Based Asset Servicing and Securitization LLC, et al.,* Case No. 08-cv-10841 (S.D.N.Y.) (consolidated with *Public Employees' Retirement System of Mississippi v. Merrill Lynch Mortgage Investors, Inc., et al.,* Case No. 09-cv-1392 (S.D.N.Y.)); and
- *In re Satyam Computer Services, Ltd. Securities Litigation,* Case No. 09-md-2027 (S.D.N.Y.).

6.     MissPERS is currently seeking to serve as a lead plaintiff and representative party

on behalf of a class in the following action filed under the federal securities laws during the three

years preceding the date of this Certification:

- *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust et al. v. J.P. Morgan Acceptance Corporation I et al.,* Case No. 08-cv-1713 (E.D.N.Y.);

7.     During the three-year period preceding the date of this Certification, MissPERS

has sought to serve as a representative party on behalf of a class in the following actions arising

under the federal securities laws:

- *Public Employees' Retirement System of Mississippi v. Morgan Stanley et al.,* Case No. 09-cv-02137 (S.D.N.Y.); and

8.     MissPERS is serving as a lead plaintiff and representative party on behalf of a

class in *In re Merck & Co. Inc. Securities, Derivative & "ERISA" Litigation,* MDL No. 1658

(SRC); 05-cv-01151 (D.N.J.); 05-cv-2367 (D.N.J.). MissPERS intervened in the action and was

appointed to serve as a lead plaintiff and representative party in the action in 2007.

9.     During the three-year period preceding the date of this Certification, MissPERS

has sought to serve as lead plaintiff on behalf of a class in the following actions arising under the

federal securities laws, but withdrew its motions for lead plaintiff or was not appointed lead

plaintiff:

- *In re Dell, Inc. Securities Litigation,* Case No. 06-cv-726 (W.D. Tex.);

- *Freudenberg v. E\*Trade Financial Corporation, et al.,* Case No. 07-cv-8538 (S.D.N.Y);
- *In re Wachovia Equity Securities Litigation,* Case No. 08-cv-6171 (S.D.N.Y.); and
- *New Orleans Employees' Retirement System, et al., v. UBS AG,* Case No. 09-cv-893 (S.D.N.Y.).

10.   MissPERS will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery, except for an award, as ordered or approved by the Court, for reasonable costs and expenses (including lost wages) directly relating to its representation of the Class.

Signed under penalty of perjury this 24th day of July 2009.

George W. Neville, Esq.
Special Assistant Attorney General
*Legal Counsel to the Public Employees' Retirement System of Mississippi*

3

**MPERS's Transactions in J.P. Morgan Acceptance Corp. (JPMAC)**
**Mortgage Pass-Through Certificates**

| Certificate | Date | Transaction | Quantity/ Face Value ($) | Price per $1 face value |
|---|---|---|---|---|
| JPMMT 2006-A5 2A1 (CUSIP: 46629CAB3) | 4/5/2007 | Buy | 3,530,000 | $1.005 |
| JPMMT 2007-A1 6A1 (CUSIP: 46630GAX3)* | 5/14/2007 | Buy | 5,760,000 | $0.982 |
| | 1/14/2009 | Sell | 4,750,204 | $0.810 |
| JPALT 2006-A4 A7 (CUSIP: 46629EAG8) | 7/27/2006 | Buy | 5,000,000 | $1.003 |
| | 9/22/2008 | Sell | 5,000,000 | $0.400 |
| JPMAT 2006-WMC3 A3 (CUSIP: 46629KAD1) | 8/22/2006 | Buy | 5,200,000 | $1.000 |
| | 1/10/2007 | Sell | 5,200,000 | $1.000 |
| JPMAT 2006-RM1 A2 (CUSIP: 46629NAC7) | 9/21/2006 | Buy | 3,600,000 | $1.000 |
| JPMAT 2006-CH2 AV2 (CUSIP: 46629QAT3) | 7/26/2007 | Buy | 300,000 | $0.997 |

* Sale quantity reflects reduced principal value of initial investment at $5,760,000 of face value, as a result of "paydowns" of principal on underlying mortgages